```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEBRASKA
2

   UNITED STATES OF AMERICA,    )
3                               )
            Plaintiff,          )      8:09CR125
4                               )      Omaha, Nebraska
   vs.                          )      June 3, 2009
5                               )      June 16, 2009
   JARED MASON,                 )
6                               )
            Defendant.          )
7

8

9

10        TRANSCRIPT OF MOTION TO SUPPRESS PROCEEDINGS
            BEFORE THE HONORABLE THOMAS D. THALKEN
11              UNITED STATES MAGISTRATE JUDGE

12

13                   A-P-P-E-A-R-A-N-C-E-S

14   FOR THE PLAINTIFF:  Ms. Sandra L. Denton
                         Assistant United States Attorney
15                       1620 Dodge Street
                         Suite 1400
16                       Omaha, NE  68102-1506

17   FOR THE DEFENDANT:  Ms. Julie B. Hansen
                         Assistant Public Federal Defender
18                       222 South 15th Street
                         Suite 300N, One Central Park Plaza
19                       Omaha, NE  68102

20

21

22

23

24
   Proceedings recorded by electronic sound recording, transcript
25 produced with computer.
```

1            (At 10 a.m. on June 3, 2009, with counsel for the

2       parties and the defendant present, the following proceedings

3       were had:)

4            THE COURT:  ... in United States vs. Mason carrying

5       the number of 8:09CR125.

6           Counsel enter their appearance for the record, please.

7           MS. DENTON:  Yes, Your Honor.  Good morning, Sandra

8       Denton, Assistant United States Attorney.

9           MS. HANSEN:  Good morning, Your Honor.  Please show

10      the appearance of Julie Hansen for Mr. Mason.

11           THE COURT:  We're here on filing number 20, the

12      defendant's motion to suppress.

13          Miss Hansen, do you wish to make an opening statement?

14           MS. HANSEN:  Judge, I -- I have a matter I'd like to

15      take up before we start.  I was out of the office last week;

16      however, on Monday I received -- I think it came in the week I

17      was gone, but I received a packet from Miss Denton with

18      additional discovery.  In that discovery, I found out that my

19      client did, in fact, make a statement.

20          Miss Denton and I have talked about that issue.  I'm

21      going to ask the Court to allow me to orally amend my motion

22      to suppress to include his verbal statement that he gave that

23      I became aware of yesterday when I read the packet that I got

24      on Monday.

25          Miss Denton has --

1          THE COURT:  Where was the -- was that the statement

2     that was made at the time he was in -- when he was first

3     interviewed or was that a subsequent time that's referred to

4     in this motion?

5          MS. HANSEN:  Judge, it appears as if there is two

6     different investigating officers.  One investigating officer

7     he invoked his Miranda rights.  Subsequently an

8     investigating -- and I'm guessing, but it appears the timing

9     is about ten minutes apart.  It looks as if Miranda was given

10    about ten minutes later and he waived his Miranda warnings to

11    a different officer.

12         THE COURT:  All right.  Any objection?

13         MS. DENTON:  I don't have any objection.

14         THE COURT:  All right.  You may --  We'll include any

15    motion to suppress statements.  Then are you prepared to

16    proceed on that today?

17         MS. HANSEN:  Yes, Your Honor, thank you.

18         THE COURT:  All right.

19         MS. HANSEN:  And I -- other than that I have no

20    opening, Your Honor.

21         THE COURT:  Miss Denton, anything -- any opening

22    statement?

23         MS. DENTON:  No, Your Honor.

24         THE COURT:  All right.  Then you may proceed.

25         MS. DENTON:  Okay.  Your Honor, the government calls

 1    Jeff Gassaway to the stand.

 2          COURTROOM DEPUTY:  Will you state your full name for

 3    the record, please, and spell your last name.

 4          THE WITNESS:  Jeffrey Darnell Gassaway,

 5    G-a-s-s-a-w-a-y.

 6          COURTROOM DEPUTY:  Please raise your right hand.

 7          JEFFREY GASSAWAY, PLAINTIFF'S WITNESS, SWORN

 8          COURTROOM DEPUTY:  Please be seated in the witness

 9    chair.

10          THE WITNESS:  Thank you.

11          THE COURT:  You may inquire.

12          MS. DENTON:  Thank you, Judge.

13                        DIRECT EXAMINATION

14    BY MS. DENTON:

15    Q.   What is your occupation?

16    A.   I'm a police officer with the City of Omaha.

17    Q.   And how long have you been so employed?

18    A.   Just over 12 years.

19    Q.   Okay.  Officer Gassaway, were you on duty on April 20th,

20    2009, at approximately 10:45 in the morning?

21    A.   Yes.

22    Q.   Okay.  And what was your assignment to that particular

23    day?

24    A.   I'm assigned to the Metro Area Fugitive Task Force and I

25    was in northeast precinct conducting research and surveillance

1    for an ongoing fugitive case.

2    Q.   Okay.  While performing those duties, did you receive a

3    dispatch concerning an armed robbery of a post office in

4    Omaha?

5    A.   Yes.  I was monitoring the northeast channel, and I did

6    not hear the initial broadcast, but I heard the subsequent

7    traffic and everything that occurred after that over the

8    radio.

9    Q.   Okay.  And was that radio traffic leading you to an

10   area -- or an address, excuse me, 6730 North Ridge Drive in

11   Omaha?

12   A.   Yes.

13   Q.   Okay.  Were you close to that location when you heard the

14   traffic over the radio?

15   A.   Yes, I was.

16   Q.   Okay.  How -- about how far away were you from that?

17   A.   Approximately two miles.

18   Q.   Okay.  Did you proceed to that location?

19   A.   Yes.

20   Q.   Okay.  Why was that location specifically broadcasted

21   over the radio, if you know?

22   A.   Yes.  A witness at the scene of the initial robbery

23   reported seeing two individuals leave the area in a black

24   minivan with the license plates Paul Union Boy 225.  They

25   broadcast that information and dispatch provided registration

1    for that ad- -- for that vehicle to be 6730 North Ridge Drive.

2    Q.   Okay.  And did you proceed to that location after hearing

3    that put over the dispatch, that address?

4    A.   Yes.

5    Q.   What'd you see when you got there?

6    A.   I was one of the first responders along with cruiser

7    officers from uniform patrol and I saw the vehicle in question

8    parked in the driveway at 6730 North Ridge.

9    Q.   What type of vehicle were you in?

10   A.   Almost exactly the same vehicle, but it's blue.  A

11   Chrysler minivan.

12   Q.   Okay.  Is it a marked police vehicle?

13   A.   No.  It's an unmarked vehicle.

14   Q.   Okay.  What did you do when you arrived?

15   A.   I --  We began to set up a perimeter on the address and I

16   set up directly in front of the house two houses to the north

17   on North Ridge Drive.

18   Q.   Okay.  When you were setting up the perimeter, was

19   anything about the house -- did anything catch your attention

20   when you were setting up the perimeter?

21   A.   Yes.  I saw --  As we were -- officers were arriving, I

22   saw someone peek out of the basement window and then I saw

23   someone peek out of the upstairs window, and I broadcasted

24   that information to arriving officers.

25   Q.   Okay.  Were you able to make any type of identification

1   of the people that were peeking out of the window whether they

2   be male, female or race or anything like that?

3   A.   No.

4   Q.   Okay.  What's the next thing that happened?

5   A.   We got the perimeter established, and Captain Carmody,

6   who is the precinct commander, arrived on scene, and we --

7   through contacting dispatch we developed a phone number inside

8   of the -- for the residence of 6730, and Captain Carmody made

9   contact with the registered owner of that vehicle Hattie

10  Mason.

11  Q.   Okay.  And was that individual Hattie Mason also

12  identified to be the owner of that particular home?

13  A.   Yes.

14  Q.   Okay.  Did the captain tell you about his contact with

15  Ms. Mason over the phone?

16  A.   Yes.  He said he made contact with -- with Miss Mason and

17  that people should be coming out of the house, and he wanted

18  me to make the initial contact with those people because of my

19  location.

20  Q.   Okay.  And did people, in fact, come out of the house?

21  A.   Yes, they did.

22  Q.   How many?

23  A.   There was three females that came out of the house, and

24  they walked to me, and I made the initial contact with them.

25  Q.   Was Hattie Mason one of them?

1    A.    Yes.

2    Q.    Okay.  And did she identify herself to you to be the

3    owner of 6730 North Ridge Drive?

4    A.    Yes.

5    Q.    Did you speak with Ms. Mason about whether there were

6    other individuals in the home?

7    A.    Yes, I did.

8    Q.    What did Ms. Mason tell you?

9    A.    Captain Carmody asked me to get some more information

10   about what -- who else was in the residence and I asked her

11   who else was inside.  She said her son Jared and his friend

12   later identified as Donnell.  I think she might have called

13   him Donald or something like that.

14   Q.    Okay.  So she indicated to you that her son Jared Mason?

15   A.    Yes.

16   Q.    And a friend of his was still in the house?

17   A.    That's correct.

18   Q.    Did she tell you where in the house?

19   A.    Yes.  I asked her where were they at in the house, and

20   she said in the basement where he stays, and I asked her how

21   did she know that, and she said I -- as I -- I seen him as I

22   was walking out of the house.

23   Q.    Okay.  When Ms. Mason stated to you in the basement,

24   that's where he stays, was she making reference to her son

25   Jared Mason?

1    A.    Yes.

2    Q.    Okay.  Did you ask her any further about what she meant

3    when she said that's where he stays?

4    A.    No, I didn't.

5    Q.    Okay.  Did you ever inquire with Ms. Mason whether or not

6    Jared Mason actually lived in the house with her?

7    A.    No.  All --  Only that she said that's where he stays and

8    that's where I left it.

9    Q.    Okay.  Did you discover from Ms. Mason in your

10   conversations with her whether or not Jared Mason had spent

11   the night the night before your presence at her residence?

12   A.    No, I did not.

13   Q.    Okay.  At some point, Officer Gassaway, did you ask

14   Hattie Mason to sign an Omaha Police Department permission for

15   search form?

16   A.    Yes.

17   Q.    Okay.  Why did you have her do this?

18   A.    Because we wanted -- Captain Carmody asked me if she

19   would give consent to search the house so we can go in and

20   search the house.

21   Q.    Okay.  How soon after your initial contact with Ms. Mason

22   did you have her sign the form?

23   A.    Approximately 30 minutes.

24   Q.    Okay.

25         MS. DENTON:  May I approach the witness, Your Honor?

1           THE COURT:  You may.

2     BY MS. DENTON:

3     Q.    Officer Gassaway, I've handed you Exhibit No. 1.  Do you

4     recognize that particular exhibit?

5     A.    Yes.

6     Q.    How do you recognize it?

7     A.    It's the permission to search form that I completed and

8     Miss Mason signed on that day.

9     Q.    Did you fill out that form yourself?

10    A.    Yes.

11    Q.    Okay.  And you observed Hattie Mason sign giving you

12    permission to search?

13    A.    Yes.

14    Q.    Did you explain to Ms. Mason that you wanted to search

15    her residence?

16    A.    Yes.

17    Q.    Did you limit the -- any of the areas where you wanted to

18    search when you were talking to her about signing this form?

19    A.    No.

20    Q.    Did she limit any of the areas that you could search when

21    you were talking about signing this form?

22    A.    No.

23    Q.    Okay.  Did you also gain permission to search something

24    other than her house?

25    A.    Yes.

1   Q.   What was that?

2   A.   Her vehicle that was parked in the driveway.

3   Q.   Okay.  At any time when you're going through the

4   permission to search form with Ms. Mason, did she ever ask you

5   any questions about it?

6   A.   No.

7   Q.   Okay.  Did she ever withdraw her consent during your

8   contact with her?

9   A.   No.

10          MS. DENTON:  Okay.  Your Honor, the government would

11   offer Exhibit No. 1.

12          THE COURT:  Any objection?

13          MS. HANSEN:  No.

14          THE COURT:  Exhibit 1'll be received.

15          MS. DENTON:  May I approach again, Your Honor?

16          THE COURT:  You may.

17   BY MS. DENTON:

18   Q.   On Exhibit No. 1 there is a date on there of May 20th,

19   2009.  Did you write down that date?

20   A.   Yes.

21   Q.   Okay.  Was that the correct date that you asked Hattie

22   Mason for permission to search?

23   A.   No, it was not.

24   Q.   Okay.  'Cause it was actually April 20th, 2009, that you

25   received this permission to search?

1    A.    Yes, that's correct.

2    Q.    So that's just an error on Exhibit No. 1?

3    A.    That's correct.

4    Q.    Okay.  When you received Miss Mason's signature on this

5    permission to search form, had contact been made with Jared

6    Mason or his friend by law enforcement at that point?

7    A.    No.

8    Q.    Okay.  Were they still in the house to the best of your

9    knowledge?

10   A.    To the best of my knowledge, yes.

11   Q.    At some point, Officer Gassaway, were you aware that

12   Jared Mason and his friend actually come -- came out of the

13   house?

14   A.    Yes.

15   Q.    Okay.  How did they --  Can you explain to the Court how

16   it was that Mr. Mason and his friend came out of the house?

17   A.    Yes.  They were --  Captain Carmody eventually made

18   contact with Mr. Mason via his cell phone that was provided by

19   Hattie Mason and then the -- we had a tactical react team one

20   house to the north.  They were instructed to come out of the

21   house and -- with their hands up and they were directed

22   verbally to the -- in close proximity of the react team at

23   which time they were taken into custody.

24   Q.    How long did it take for Jared Mason and his friend to

25   surrender from the time that you got there?

1   A.   It was approximately 90 minutes, I think.

2   Q.   Okay.  And they were called out by police officers over

3   like a loudspeaker?

4   A.   Yes.  One officer had a bullhorn that was giving

5   continuous commands for them to come out of the house.

6   Q.   Okay.  Did you also attempt to make contact with Jared

7   Mason to have him surrender himself?

8   A.   Yes.

9   Q.   How did you do so?

10  A.   Via a cell phone.  When I got the number from Hattie

11  Mason, I called it and I got a voice mail, and I left a

12  message essentially instructing him and Donnell to come

13  outside and do so with their hands in the air.

14  Q.   Did you ever get a response from that telephone call you

15  made?

16  A.   I did not, no.

17  Q.   Okay.  Did you observe Jared Mason and the other

18  individual surrender from the house?

19  A.   Yes.

20  Q.   Can you tell the Court about that, please?

21  A.   Yes.  Jared -- Jared Mason came out first, and as I

22  described earlier, he was -- he came out with his hands in his

23  hair -- in the air.  He was directed to the north when the

24  react team took him into custody, and shortly thereafter

25  Donnell was instructed to come out of the house, and he did

1    the same.

2    Q.   Do you see Jared Mason in the courtroom today?

3    A.   Yes, I do.

4    Q.   Can you point him out, please, and describe what he's

5    wearing?

6    A.   Yes.  He's sitting with counsel in the orange jumpsuit

7    and facial hair, African-American male.

8         MS. DENTON:  Your Honor, may the record reflect the

9    witness identified the defendant?

10        THE COURT:  The record will speak for itself.

11   BY MS. DENTON:

12   Q.   When Mr. Mason came out of the residence, did you have

13   contact with him?

14   A.   No, I did not.

15   Q.   Okay.  Did you interview him in any way?

16   A.   No.

17   Q.   Did you ever ask him for permission to search Hattie

18   Mason's residence?

19   A.   No, I did not.

20   Q.   Thank you, Officer Gassaway.

21        MS. DENTON:  Your Honor, that's all I have for this

22   witness at this time.

23        THE COURT:  You may cross.

24        MS. HANSEN:  Thank you.

25

1                         CROSS-EXAMINATION

2       BY MS. HANSEN:

3       Q.   When Miss Mason had contact with you relating to the

4       consent to search, did you -- you indicated you explained the

5       form to her.  Did you have any difficulty understanding Miss

6       Mason?

7       A.   No, I did not.

8       Q.   Did she ask any questions about the form?

9       A.   No.  I explained what we -- what the form was and she did

10      not ask any questions.

11      Q.   Did you explain what you were searching for to her?

12      A.   No, I did not.

13      Q.   Have you ever had any contact with Miss Mason or -- or

14      Jared Mason prior to -- to the date that you've testified

15      about?

16      A.   No.

17      Q.   How about subsequent to that date?

18      A.   No.

19              MS. HANSEN:  No further questions.

20              THE COURT:  Redirect?

21              MS. DENTON:  No, Your Honor.

22              THE COURT:  May the witness be excused?

23              MS. HANSEN:  Yes, Your Honor.

24              THE COURT:  You're excused as a witness.

25          May I have Exhibit 1, please.

```
 1                    THE WITNESS:  Thank you.

 2                    MS. DENTON:  I'm sorry, Your Honor?

 3                    THE COURT:  May I have Exhibit 1, please.

 4                    MS. DENTON:  Yes, Your Honor.

 5              May I retrieve my next witness, Your Honor?

 6                    THE COURT:  You may.

 7                    MS. DENTON:  Your Honor, the government calls Kerry

 8        Morfeld to the stand.

 9                    COURTROOM DEPUTY:  Will you state your full name for

10        the record, please, and spell your first name and your last

11        name.

12                    THE WITNESS:  Kerry Morfeld, K-e-r-r-y, Morfeld,

13        M-o-r-f-e-l-d.

14                    COURTROOM DEPUTY:  Please raise your right hand.

15                     KERRY MORFELD, PLAINTIFF'S WITNESS, SWORN

16                    COURTROOM DEPUTY:  Please be seated in the witness

17        chair.

18                    THE COURT:  You may inquire.

19                    MS. DENTON:  Thank you, Judge.

20                              DIRECT EXAMINATION

21        BY MS. DENTON:

22        Q.   What is your occupation?

23        A.   I'm a police officer.

24        Q.   Okay.  With the City of Omaha?

25        A.   Yes.
```

 1    Q.   And how long have you been so employed?

 2    A.   With the City of Omaha, since October of '99.

 3    Q.   Okay.  Were you on duty, Officer Morfeld, on April 20th,

 4    2009?

 5    A.   Yes, I was.

 6    Q.   And what were your duties with the Omaha Police

 7    Department on that particular day?

 8    A.   On that day I was assigned criminal investigations, major

 9    crimes, robbery unit.

10    Q.   Okay.  Were you called to assist the United States Postal

11    Service in the investigation of a robbery that occurred at

12    2910 State Street in Omaha on that day April 20th, 2009?

13    A.   Yes.

14    Q.   Okay.  During the course of this investigation, Officer

15    Morfeld, did you go to the residence of a Hattie Mason?

16    A.   Yes, I did.

17    Q.   Okay.  And that was at 6730 North Ridge Drive?

18    A.   Yes.

19    Q.   When you made contact with her initially, where did

20    you -- where did you see her?

21    A.   I saw her in a van.  I believe it is the van belonging to

22    Officer Gassaway.

23    Q.   Okay.  And what was happening at the residence when you

24    arrived?

25    A.   It was -- a perimeter was being set up around it.

1    Q.    Okay.  And at that -- at the time that you arrived,

2    Hattie Mason was already in the van of Officer Gassaway?

3    A.    Yes.

4    Q.    Okay.  And did you make contact with Ms. Mason and

5    attempt to speak with her about what was going on in her

6    residence?

7    A.    I did.

8    Q.    Okay.  What did Miss Mason tell you?

9    A.    Hattie Mason stated that she had been in the house.  She

10   stated that she wasn't aware that police were outside until

11   she was drawing a bath for herself and she heard somebody

12   screaming and yelling that the police were outside, and she

13   was asked to leave the house with the other occupants of the

14   house.

15   Q.    Okay.  Did Miss Mason indicate to you who all was present

16   in the house before the police arrived?

17   A.    She did.

18   Q.    What did she tell you?

19   A.    She stated that she was in the house with her daughter

20   and her granddaughter and her son Jared Mason was in the house

21   and a friend -- a friend of his she only knew as -- she

22   thought it was Darnell.

23   Q.    Okay.  Did you speak with Ms. Mason about whether or not

24   Jared Mason lived at that address with her?

25   A.    I did.

MORFELD - DIRECT                                                    19

1    Q.   What did she tell you?

2    A.   She stated that Jared had just been released from the

3    penitentiary in March 23rd of 2009 and since then he had been

4    living with her other son Tyrone Reed at 50th and Spaulding.

5    I believe the address was 5008 Spaulding.

6    Q.   Okay.  And so Ms. Mason indicated to you that on

7    April 20th, 2009, and that approximately a month before then

8    Jared Mason had been living with her son, not with her at that

9    North Ridge address?

10   A.   Yes.

11   Q.   Okay.  Did Miss Mason indicate to you whether or not

12   Jared Mason had spent the night the night before this incident

13   occurred?

14   A.   Miss Mason said he did not.  He arrived at 6 a.m. --

15   Q.   Okay.

16   A.   -- or approximately 6 a.m.

17   Q.   What did Ms. Mason tell you happened when Jared Mason got

18   to her house at 6 a.m. on April 20th, 2009?

19   A.   She had stated that she was surprised he was there 'cause

20   he's usually not there that early, and usually her son Tyrone

21   brings him over there on Mondays so that he can borrow the van

22   to go to his appointment with his parole officer.

23   Q.   Okay.  Did Miss Mason indicate to you whether or not

24   Jared Mason had taken her van on that day?

25   A.   Yes.  Miss Mason said that Jared had taken the van to go

 1    to the parole appointment.

 2    Q.   Okay.  Did she tell you about what time?

 3    A.   She wasn't sure.  She thought it was approximately an

 4    hour or so prior to officers making contact.

 5    Q.   Okay.  Did she -- did Ms. Mason indicate to you that

 6    Jared Mason had returned to her residence before police

 7    arrived?

 8    A.   Yes.

 9    Q.   And how soon before police arrived did Jared Mason return

10    with the van?

11    A.   She stated approximately 15 minutes prior to the officers

12    making contact.

13    Q.   Okay.  Were you present, Officer Morfeld, when Officer

14    Gassaway obtained permission to search from Hattie Mason?

15    A.   No, I was not.

16    Q.   Okay.  Had that permission to search to the best of your

17    knowledge already been obtained by Officer Gassaway?

18    A.   Yes, it was.

19    Q.   Okay.  Did you see the permission to search form already

20    filled out or no?

21    A.   Yes, I did.

22    Q.   Okay.  Did you once again speak with Miss Mason about her

23    giving the officers or law enforcement permission to search

24    her residence or did you not address that with her?

25    A.   I did not address that with her.

1    Q.    Okay.  Were you present, Officer Morfeld, when Jared

2    Mason and Donnell Smith eventually came out of the residence?

3    A.    I was at the scene when they did come out of the

4    residence.

5    Q.    Okay.  How did they come out of the residence?

6    A.    I was still interviewing.  I was at the scene.  I did not

7    observe them exiting the residence.

8    Q.    Okay.  At some point, though, you do have contact and

9    conversations with Jared Mason; is that correct?

10   A.    I do.

11   Q.    And where does that occur?

12   A.    Central station.

13   Q.    Okay.  Is that the first time you have contact with Jared

14   Mason is at Central?

15   A.    I may have had contact when they were jogging around the

16   vehicles and securing them inside the vehicles.

17   Q.    Okay.  What type of contact, if any, would you have had

18   to the best of your memory?

19   A.    Just security.

20   Q.    Okay.  No conversations?

21   A.    No conversation.

22   Q.    No searching?

23   A.    No.

24   Q.    Okay.  When you had contact with Jared Mason, that was at

25   Central Police Headquarters like you stated, correct?

1    A.    Correct.

2    Q.    Okay.  And you attempted to interview him about his

3    involvement in the post office robbery?

4    A.    Correct.

5    Q.    Do you see Jared Mason here in the courtroom?

6    A.    I do.

7    Q.    Can you point him out, please, and describe what he's

8    wearing?

9    A.    He's sitted -- sitting at the defense table and he is

10   wearing an orange jumpsuit.

11   Q.    Okay.  When you spoke with Mr. Mason and he was at

12   Central Police Headquarters, was he in an interview room?

13   A.    Yes, he was.

14   Q.    Okay.  Was audio and video equipment activated during

15   your interview with Jared Mason?

16   A.    No, it was not.

17   Q.    Okay.  Did you have the ability to audio or videotape

18   this interview?

19   A.    I did not check to see if it was working.

20   Q.    Okay.  When you interviewed Jared Mason, did you read him

21   his rights off of the Omaha Police Department Rights Advisory

22   Form?

23   A.    Yes, I did.

24   Q.    Did you fill out that form and -- and record Jared

25   Mason's answers?

 1    A.   I did.

 2              MS. DENTON:  Your Honor, may I approach the witness?

 3              THE COURT:  You may.

 4    BY MS. DENTON:

 5    Q.   Officer Morfeld, I've placed Exhibit No. 2 in front of

 6    you.  Do you recognize that document?

 7    A.   Yes, I do.

 8    Q.   How do you recognize it?

 9    A.   That is the form that was completed when I read him his

10    rights from the form.

11    Q.   Okay.  And did you read the rights verbatim as they are

12    listed on Exhibit No. 2?

13    A.   Yes, I did.

14    Q.   Did you record the defendant's answers verbatim on

15    Exhibit No. 2?

16    A.   Yes, I did.

17    Q.   At any time when you were reading Mr. Mason his rights

18    off of Exhibit No. 2, did it ever appear to you that he didn't

19    understand what you were saying or was confused in any way?

20    A.   No.

21    Q.   Did he ever ask you any questions about any of the rights

22    that you read to him?

23    A.   No.

24    Q.   Okay.  As a law enforcement officer, you've received

25    training with regard to whether or not people are under the

1    influence of either alcohol or drugs I would take?

2    A.    Yes.

3    Q.    And have had experience in dealing with people that are

4    under the influence of alcohol or drugs?

5    A.    Yes.

6    Q.    Did Mr. Mason appear to you to be under the influence of

7    either alcohol or drugs when you were reading him his rights

8    or anytime during your contact with him?

9    A.    No.

10   Q.    At any time did you threaten him, Officer Morfeld, in an

11   attempt to gain a statement from him?

12   A.    No.

13   Q.    Did you ever make him any promises in exchange for a

14   statement that he may give you?

15   A.    No.

16   Q.    Okay.  On Exhibit No. 2, does it record on there the time

17   that your interview with him started?

18   A.    Yes.

19   Q.    And the ending time as well?

20   A.    Yes, it does.

21   Q.    Okay.  At any time during your interview with Mr. Morfeld

22   {sic}, did you -- did he ever ask for an attorney?

23   A.    No, he did not.

24   Q.    Did he ever ask to end the interview?

25   A.    He asked to end the interview prior to --  Prior to

1    giving the buccal swabs, he asked to end the interview which

2    would have been after the 1630 hours.

3    Q.   Okay.  And did you end the interview at that time?

4    A.   Yes.

5    Q.   Okay.

6         MS. DENTON:  Your Honor, the government would offer

7    Exhibit No. 2.

8         THE COURT:  Any objection?

9         MS. HANSEN:  No.

10        THE COURT:  Exhibit 2 will be received.

11   BY MS. DENTON:

12   Q.   During your conversations with Jared Mason, Officer

13   Morfeld, did you ever speak with him about where he was

14   residing around the time frame of April 20th, 2009?

15   A.   Yes, I did.

16   Q.   What did Mr. Mason tell you?

17   A.   He stated that he was living with his brother.

18   Q.   Okay.  Did he give you an address?

19   A.   Yes.

20   Q.   And what was that?

21   A.   The 5008 Spaulding.

22   Q.   Okay.  The same address that Hattie Mason had given you

23   as where Jared was living --

24   A.   Yes.

25   Q.   -- after his release from prison?

1    A.    Yes.

2    Q.    Did Jared Mason ever claim to you that he lived at 6730

3    North Ridge Drive -- North Ridge Drive with his mother?

4    A.    No.

5    Q.    Did he ever indicate to you that he spent the night prior

6    to April 20th, 2009?

7    A.    No.

8    Q.    I'm going to take you back, Officer Morfeld, to when you

9    were interviewing Hattie Mason at the residence when you

10   initially arrived to respond to the scene.  Did you speak with

11   an individual about a bedroom that was downstairs in the

12   basement and who it belonged to?

13   A.    Yes, I did.

14   Q.    And who did you speak with?

15   A.    I believe it was Darecia (phonetic) Garner.

16   Q.    Okay.  And how is she related to Hattie Mason, if at all?

17   A.    She is -- Darecia is her granddaughter.

18   Q.    Okay.  And what did Darecia tell you about the bedroom

19   down in the basement?

20   A.    She stated that that's her bedroom and that's where she

21   was sleeping.

22   Q.    Okay.  At the time that the police officers arrived?

23   A.    Correct.

24   Q.    Thank you, Officer Morfeld.

25         MS. DENTON:  Your Honor, that's all I have for this

1    witness at this time.

2              THE COURT:  Cross?

3              MS. HANSEN:  Thank you.

4                          CROSS-EXAMINATION

5    BY MS. HANSEN:

6    Q.   Taking you back to the Miranda form that you filled out

7    with Mr. Mason that started -- at least the giving the Miranda

8    rights started at about 2:27 in the morning -- or 2:27, I'm

9    sorry, in the afternoon?

10   A.   Correct.

11   Q.   And the interview concluded at 4:30 in the afternoon?

12   A.   Yes.

13   Q.   So it lasted for a few minutes over two hours?

14   A.   Yes.

15   Q.   You indicated that the interview was down at Central

16   headquarters?

17   A.   Yes.

18   Q.   What floor?

19   A.   Fourth floor.

20   Q.   And those interview rooms are equipped with audio and

21   video equipment; is that correct?

22   A.   They were previously equipped.  We're in the process of

23   changing over to a digital system, so they have not been fixed

24   as the equipment breaks.

25   Q.   Okay.  And as it relates to the particular room that

1    Mr. Mason was in, did you make any attempt to determine if

2    there was equipment that was working?

3    A.   I did not.

4    Q.   Have you interviewed people in those rooms on previous

5    occasions?

6    A.   I have.

7    Q.   And when you interview people in those rooms, have you in

8    the past activated the video equipment yourself?

9    A.   In that particular room?

10   Q.   Yeah.

11   A.   I have not interviewed anybody in that particular room

12   with the audiovisual equipment recently.

13   Q.   Okay.  In the past have you ever activated the

14   audiovisual equipment in that room yourself?

15   A.   Yes, in the past I have.

16   Q.   On how many occasions?

17   A.   I have no idea.

18   Q.   Over 20?

19   A.   May have.

20   Q.   Okay.  And there's a group of rooms on that floor; is

21   that correct?

22   A.   Yes, there is.

23   Q.   And all of those rooms in general are equipped with

24   recording devices; is that correct?  And I'm -- I'm talking

25   about in general.  I know that you're undergoing a switch

MORFELD - CROSS                                                    29

```
 1    but --

 2    A.   Yes --

 3    Q.   -- in general.

 4    A.   -- in general.

 5    Q.   And in general when you use those rooms yourself, have

 6    you activated in general the audio/video equipment?

 7    A.   Yes.

 8    Q.   So it's not up to somebody else to activate the

 9    equipment?  You do it yourself essentially?

10    A.   Yes, or you have somebody else do it for you.

11    Q.   Did you request anybody else to activate or to determine

12    if the video equipment was working?

13    A.   No, I did not.

14    Q.   Mr. Mason you've indicated on Exhibit No. 2 answered yes

15    to all of the questions?

16    A.   Yes.

17    Q.   Was anybody else in the room while you were interviewing

18    Mr. Mason?

19    A.   Initially, the postal inspector was.

20    Q.   And the postal inspector's name?

21    A.   I don't recall.

22    Q.   Galen Lewis?

23    A.   That sounds correct.

24    Q.   Did that person leave at some point?

25    A.   Yes, he did.
```

1    Q.    Can you just describe whether that was before or after

2    Miranda?

3    A.    That would have been after Miranda.

4    Q.    Did he -- did he watch or -- or sit there during a

5    portion of the statement or was it essentially he left right

6    after Miranda was given?

7    A.    A portion of the statement.

8    Q.    Did you specifically ask Mr. Mason if he had spent the

9    night at his mother's house?

10   A.    No.

11   Q.    Did you specifically ask Mr. Mason if at times he stayed

12   at his mother's house?

13   A.    No.

14   Q.    Did you enter the residence?

15   A.    Yes, I did.

16   Q.    And in the basement portion of the residence, there are a

17   couple of rooms; is that correct?

18   A.    Yes, there is.

19   Q.    And there is a living room portion of the basement; is

20   that correct?

21   A.    Yes.

22   Q.    Where there's a couch?

23   A.    Yes.

24   Q.    You interviewed Mr. Mason's brother; is that correct?

25   A.    Yes.

1    Q.   Tyrone Reed?

2    A.   Yes.

3    Q.   And that was the brother that he generally lives with?

4    A.   Yes.

5    Q.   And Mr. Reed indicated to you that Mr. Mason did not come

6    to the home that they shared the evening previous; is that

7    correct?

8    A.   He stated that he didn't come home last night.

9    Q.   Okay.  Did you participate in the interview of Mr. Smith?

10   A.   No, I did not.

11   Q.   And approximately two minutes after what you put down as

12   the end time on the Miranda form for Mr. Mason's statements --

13   about two minutes later was when the buccal swabs were taken;

14   is that correct?

15   A.   It was approximately...

16   Q.   Within five minutes, correct?

17   A.   Sure.

18            MS. HANSEN:  May I have just a moment?

19            THE COURT:  You may.

20            MS. HANSEN:  No further questions.

21            THE COURT:  Redirect?

22            MS. DENTON:  Yes, Your Honor.

23                     REDIRECT EXAMINATION

24   BY MS. DENTON:

25   Q.   Officer Morfeld, have you had a chance to review a report

1    written by the United States Postal Service Officer Lewis?

2    A.   Yes, I did.

3    Q.   Okay.  And did you read in his report that Jared Mason

4    had invoked his rights and was not interviewed?

5    A.   Yes.

6    Q.   Okay.  Was there ever a time that you're aware of that

7    Inspector Lewis would have been with Jared Mason when you were

8    not?

9    A.   No.

10   Q.   Okay.  When you read this in his report that on

11   April 20th, 2009, at approximately 2:50 p.m. that you

12   attempted to interview Jared Mason with Inspector Lewis and

13   Mason invoked his rights and was not interviewed, is that

14   correct?

15   A.   No, it's not.

16   Q.   Okay.  Have you spoke with Investigator -- or Inspector

17   Lewis to determine why he wrote this in his report?

18   A.   No.  I just observed the report a few minutes prior to

19   coming in here.

20        MS. DENTON:  Okay.  I don't have anything further,

21   Your Honor.

22        THE COURT:  May the witness be excused?

23        MS. HANSEN:  Yes, Your Honor.

24        THE COURT:  All right.  You're excused as a witness.

25   You can hand the exhibit to the clerk as you pass.

1                    MS. DENTON:  May I be excused to get my next witness?

2                    THE COURT:  You may.

3                    MS. DENTON:  Thank you.

4          Your Honor, the government calls Matt Chandler to the

5     stand.

6                    THE COURT:  Okay.

7                    COURTROOM DEPUTY:  Will you state your full name for

8     the record, please, and spell your last name.

9                    THE WITNESS:  My name's Matt Chandler,

10    C-h-a-n-d-l-e-r.

11                   COURTROOM DEPUTY:  Please raise your right hand.

12                    MATT CHANDLER, PLAINTIFF'S WITNESS, SWORN

13                   COURTROOM DEPUTY:  Please be seated in the witness

14    chair.

15                   THE COURT:  You may inquire.

16                   MS. DENTON:  Thank you, Judge.

17                              DIRECT EXAMINATION

18    BY MS. DENTON:

19    Q.   What is your occupation, sir?

20    A.   Omaha police detective.

21    Q.   And how long have you been so employed?

22    A.   Ten years.

23    Q.   Okay.  Detective Chandler, were you on duty on

24    April 20th, 2009?

25    A.   Yes.

1    Q.    Were you assigned to assist in the investigation of a

2    robbery of a United States Post Office, 2910 State Street?

3    A.    Yes.

4    Q.    As part of your duties in the investigation of this

5    matter, Detective Chandler, did you go to an address on North

6    Ridge Drive with respect to a vehicle that had been located

7    there?

8    A.    Yes.  6730 North Ridge.

9    Q.    Did you go by yourself or were you with -- with a

10   partner?

11   A.    I went with Sergeant Mike Ratliff.

12   Q.    Okay.  What was happening when you arrived?

13   A.    When we arrived there, there had been two suspects in the

14   armed robbery who were still inside the house and refusing

15   commands to come outside.  There was a tactical team that was

16   negotiating for the two to come out peacefully.  We waited a

17   safe distance until they had.

18   Q.    Okay.  Did you observe two people come outside?

19   A.    Yes, I did.

20   Q.    And who did you observe come out?  Were they later

21   identified to you?

22   A.    Yes.  They were identified as Jared Mason and a

23   co-defendant Donnell Smith.

24   Q.    Do you see Jared Mason in the courtroom?

25   A.    Yes.  When he was brought out in handcuffs, I recognized

1    him at the defense table.  I also checked his person at the

2    scene for weapons or items of escape.

3    Q.   Okay.  When you arrived at the scene and waited for the

4    defendant to come out of the residence, did you have contact

5    at all with a Hattie Mason at that time?

6    A.   No.

7    Q.   Okay.  Did you go in and search the residence once Jared

8    Mason and Donnell Smith were taken out of it?

9    A.   Yes.  About 10 or 15 minutes after they'd surrendered, we

10   had a team that entered the house and searched it.

11   Q.   Okay.  When you searched the -- after you searched the

12   house, Detective Chandler, were you involved then in the

13   interview of Donnell Smith at Central Police Headquarters?

14   A.   Yes.

15   Q.   During that interview of Donnell Smith, did you receive

16   information that there may still have been evidence in the

17   house that you did not locate?

18   A.   Yes.

19   Q.   Did you then attempt to go back to the residence on North

20   Ridge Drive to retrieve that evidence?

21   A.   Yes.

22   Q.   Approximately what time did you go back to the address on

23   North Ridge Drive to retrieve -- retrieve evidence that you

24   did not get during the first search?

25   A.   1650 hours.

1    Q.   Okay.  So that would have been two or three hours after

2    your initial contact at that residence?

3    A.   Yes, on the same day.

4    Q.   Okay.  And on the permission to search form --  You've

5    seen that particular form; is that correct?

6    A.   Yes.

7    Q.   Okay.  And on that form it shows initial entry by law

8    enforcement approximately 12:30 in the afternoon?

9    A.   That's correct.

10   Q.   And then there's a slash and then there's another time

11   after it; is that correct?

12   A.   Yes.

13   Q.   And was that second time that was put on that form put on

14   there to reflect your second search of the residence?

15   A.   Yes.

16   Q.   When you -- or before you go back to the house on North

17   Ridge Drive, did you attempt to make contact with the owner to

18   let them know that you're coming?

19   A.   Yes.

20   Q.   How do you do so?

21   A.   I telephoned Hattie Mason.  She provided me her phone

22   number after we'd completed the initial search.

23   Q.   Okay.  And you called her on the telephone from Central?

24   A.   On my cell phone.

25   Q.   On your -- on your cell phone.  Did you identify yourself

1    as an Omaha Police Department officer?

2    A.   Yes, ma'am.

3    Q.   And did you tell her why you wanted to come back out

4    there?

5    A.   Yes, I did.

6    Q.   And what'd you say to her?

7    A.   I said we'd learned that there was additional evidence in

8    the house, and we'd like to come back and get it, and she said

9    that'd be fine.

10   Q.   Okay.  At the time that you had this conversation and

11   received the consent from Hattie Mason, was Jared Mason

12   already in custody with law enforcement?

13   A.   Yes.

14   Q.   Did you attempt to obtain consent from Jared Mason at

15   that time?

16   A.   No.

17   Q.   Okay.  After speaking with Hattie Mason, did you once

18   again go back to the residence?

19   A.   Yes.

20   Q.   And make entry?

21   A.   Yes.

22   Q.   Okay.  How did you do so?

23   A.   We knocked on the front door and she answered.  We

24   explained then in detail that we learned there was a rifle

25   used during the robbery, and it was downstairs in a laundry

1    room hidden behind a small door, and she asked us to please go

2    get it.  She actually begged me to please go get it.

3        We went downstairs and we noticed that Ms. Mason and

4    other occupants of the house had started to clean up from the

5    initial search putting couch cushions back together and

6    things, and we found the rifle right away.  I handled it

7    carefully trying to preserve evidence.

8        We then explained to Miss Mason what we recovered and

9    where.  She asked us again to reassure her that there was no

10   additional firearms in the house.  I told her that every

11   firearm we discovered we'd taken as evidence, it would be the

12   one rifle, and then we left.  It took about nine minutes.

13             MS. DENTON:  Okay.  May I approach the witness, Your

14   Honor?

15             THE COURT:  You may.

16   BY MS. DENTON:

17   Q.   Officer Chandler, I put in front of you Exhibits 3 and 4.

18   First of all, Exhibit No. 3, do you recognize what that

19   depicts?

20   A.   Yes, ma'am.  That's a OPD crime scene investigator

21   photograph of the exterior of this house the way it looked

22   that day.  That was taken the day I was there.

23   Q.   Okay.  Hattie Mason's residence?

24   A.   Yes, ma'am.

25   Q.   Okay.  And the van that you can see in the driveway, is

1    that the van that police were searching for that led him --

2    that led you to that particular address?

3    A.   Yes, ma'am.

4    Q.   Okay.  And is that a true and accurate depiction of how

5    the house looked on April 20th, 2009?

6    A.   Yes.

7              MS. DENTON:  The government would offer Exhibit 3,

8    Your Honor.

9              MS. HANSEN:  No objection.

10             THE COURT:  Exhibit 3'll be received.

11   BY MS. DENTON:

12   Q.   Drawing your attention now to Exhibit No. 4, do you

13   recognize what is depicted in that picture?

14   A.   Yes, ma'am.  That's the basement of the same house.

15   Q.   Okay.  And you were down in that basement?

16   A.   I did -- I was.

17   Q.   On two separate occasions?

18   A.   Yes.

19   Q.   Okay.  In that particular picture, does it show on

20   there -- or when -- let me back up.  When you were down in the

21   basement, did you observe a separate bedroom area?

22   A.   Yes.  The bedroom area can be seen in this photograph.

23   It's at the far end and in the house it would be at the south

24   end of the house.

25   Q.   Okay.  So in that particular photograph, can you see a

 1    couch?

 2    A.   Yes, I -- I can.

 3    Q.   Okay.  And where is the bedroom with respect to the

 4    couch?

 5    A.   It's further in the background of the photograph.  It has

 6    an ajarred door open and it's -- it would be south of the

 7    couch in the house.

 8    Q.   Okay.  Can you hold up that photograph and point out for

 9    the judge, please, where the bedroom is located in that

10    particular picture?

11    A.   Judge, it's right here.

12         THE COURT:  Have the witness mark -- use a pencil or

13    pen up here.

14         THE WITNESS:  I have one.

15         THE COURT:  If you will circle or X or do something

16    to indicate where you pointed.

17    BY MS. DENTON:

18    Q.   Okay.  Have you marked the area where the bedroom is?

19    A.   Yes, I did.

20    Q.   How did you mark it?

21    A.   In a dark pen on a dark photograph, but you can see it.

22    Q.   What did you mark exactly?

23    A.   I -- I put an X on the door of the bedroom in the

24    basement --

25    Q.   Okay.

 1    A.    -- with a circle around it.

 2    Q.    Okay.  And the bedroom is not the location where you

 3    ended up finding the rifle on the second search; is that

 4    correct?

 5    A.    That's correct.

 6    Q.    That was found in a separate location?

 7    A.    Yes, ma'am.  It was in a laundry room.

 8    Q.    Okay.

 9    A.    You can see the door to the laundry room in this

10    photograph.  It's adjacent to the bedroom.

11    Q.    Okay.  Can you mark on there just with a circle, not with

12    an X, where the laundry room door is?

13    A.    Yes.

14    Q.    Is that laundry room in any way connected to the bedroom?

15    A.    No.

16    Q.    Is it in any way connected to the common living space

17    there in the basement?

18    A.    No.

19    Q.    It's its own separate area?

20    A.    Yes.

21    Q.    Okay.  When you went in the second time and spoke with

22    Miss Mason about what you wanted to look for, did she in any

23    way try to limit your search of her house?

24    A.    No.

25    Q.    Did she in any way withdraw her consent at any time when

1    you were there searching the second time?

2    A.    No.

3    Q.    Okay.  Thank you, Officer Chandler.

4          MS. DENTON:  Your Honor, that's all I have of this

5    witness at this time.

6          THE COURT:  All right.  You may cross.

7          MS. HANSEN:  Thank you.

8                           CROSS-EXAMINATION

9    BY MS. HANSEN:

10   Q.    The couch is in a common area?  Is that what you've

11   described it as?

12   A.    Yes.

13   Q.    Is there any other furniture in that area?

14   A.    Yes.  There were other chairs.

15   Q.    Any other couches or love seats?

16   A.    You might call that a love seat, yes, next to the couch

17   that's seen in the photograph.  I think there's a jacket

18   laying over the top.  I can see a chair at the other end also.

19   Q.    And the laundry room is adjacent to -- there's a door

20   that separates it -- a doorway that separates it, but that's

21   adjacent to that common area?

22   A.    Yes.

23   Q.    Did you ever ask any of the individuals involved in this

24   case whether or not Mr. Mason slept in that common area?

25   A.    No.

CHANDLER - CROSS                                                    43

1    Q.    Did you notice or -- or retrieve or book into property

2    any items of evidentiary value associated with Mr. Mason from

3    that area?

4    A.    From the area where the rifle was recovered?

5    Q.    From the -- what we've called the common area or the

6    living room area in the basement.

7    A.    I did not, no.

8    Q.    Are you aware of any?

9    A.    I'm not aware of any.  You're speaking with regards to

10   venue?

11   Q.    No, just clothing or shoes --

12   A.    I'm not aware of any.

13   Q.    -- anything like that?  There were some shells --

14   A.    Yes.

15   Q.    -- recovered.  Do you recall where they were recovered

16   from?

17   A.    I was told they came from a shoebox.

18   Q.    Where in the house?

19   A.    There were two areas where ammunition was pointed out to

20   me during the search.  One was in the laundry room and one was

21   in the bedroom, and I'm not certain where the ammunition -- I

22   know that there's a photograph of some.  I'm not certain where

23   that came from.  I didn't recover it.

24   Q.    Okay.  From your contact with Miss Mason, would you

25   believe that ammunition to have been the property of her?

1    A.   No, absolutely not.

2    Q.   And did you have any contact with the other two women in

3    the -- in the home?

4    A.   Yes.

5    Q.   Would you have believed that that ammunition came from

6    those individuals?

7    A.   No.

8    Q.   The ammunition in any event was recovered from the

9    downstairs portion of the home?

10   A.   Yes.

11          MS. HANSEN:  No further questions.

12          THE COURT:  Redirect?

13                        REDIRECT EXAMINATION

14   BY MS. DENTON:

15   Q.   Officer Chandler, during this investigation, were you

16   able to determine what address Mr. Mason had listed on his

17   driver's license?

18   A.   5008 Spaulding.

19   Q.   Okay.  And that driver's license was issued when?

20   A.   March 25, 2009.

21   Q.   Thank you, Officer Chandler.

22   A.   Yes, ma'am.

23          MS. DENTON:  Your Honor, that's all I have.

24          THE COURT:  May I see the -- Exhibit 4, please?  The

25   rifle was found in the --

 1          Mary Beth, do you have a yellow marker or something

 2     that's...

 3          (An off-the-record discussion was had between the

 4     courtroom deputy and the Court.)

 5               THE COURT:  All right.  Retrace your markings on

 6     that.

 7               THE WITNESS:  Yes, sir.

 8               THE COURT:  You retraced them in red now; is that

 9     correct?

10               THE WITNESS:  Yes, I did.

11               THE COURT:  All right.  How many bedrooms were in the

12     basement?

13               THE WITNESS:  One.

14               THE COURT:  And that's reflected by the circle with

15     the X in it; is that correct?

16               THE WITNESS:  Yes, sir.

17               THE COURT:  And then the laundry room is where the

18     circle is?

19               THE WITNESS:  Yes, sir.

20               THE COURT:  Did that have a door on it?

21               THE WITNESS:  Yes.

22               THE COURT:  What was in the laundry room?

23               THE WITNESS:  A washer and dryer, stacks of clothes,

24     an old dresser for storage.

25               THE COURT:  And where was the rifle found?

1            THE WITNESS:  Next --  Actually, north about four

2    feet from the washer and dryer.  Kind of back behind --  It

3    would essentially, Your Honor, be underneath the void --

4    underneath the stairway.

5            THE COURT:  All right.  If those questions prompt

6    questions by either side, you may now inquire.

7            MS. DENTON:  The government doesn't have any, Your

8    Honor.

9            MS. HANSEN:  I have one.

10                         RECROSS-EXAMINATION

11   BY MS. HANSEN:

12   Q.   I talked to you earlier about ammunition that was

13   located?

14   A.   Yes.

15   Q.   The ammunition that was located were two different

16   brands; is that accurate?

17   A.   Ma'am, there were several people effecting the search of

18   this residence, and I'm not personally knowledgeable of what

19   brands of ammunition were recovered.

20   Q.   Do you recall if one was -- one type of ammunition was

21   for a revolver or a small handgun versus the long gun or the

22   rifle that was located by you in the second search?

23   A.   I'm not aware of the difference.

24   Q.   Okay.

25            MS. HANSEN:  No further questions of this witness.

1          MS. DENTON:  I don't have anything further, Judge.

2          THE COURT:  All right.  May the witness be excused?

3          MS. DENTON:  Yes, Your Honor.

4          MS. HANSEN:  Yes.

5          THE COURT:  All right.  You're excused as a witness.

6          THE WITNESS:  And Exhibit 3, Your Honor?  Leave it?

7          THE COURT:  Just hand it to the clerk as you pass.

8          THE WITNESS:  Okay.

9          MS. HANSEN:  Judge, if I -- at this point if I may be

10   heard for just a moment?

11         THE COURT:  You may.

12         MS. HANSEN:  I got that the defendant --

13         THE COURT:  Be seated.

14         MS. HANSEN:  Thank you.  Judge, Miss Denton and I

15   have been conversing about this case for the last day

16   approximately since I came back and read through the

17   additional discovery.  I -- I would tell the Court that the

18   inspector -- the postal inspector's report which was in the

19   initial discovery that we received before I wrote my motion --

20   and I've indicated to the Court that in that -- in that report

21   he indicated that Mr. Mason invoked his Miranda rights.

22       That's essentially the only thing he says.  There's no

23   mention of any statements by Mr. Mason.  When I read through

24   the additional discovery that came into the office May 28th,

25   that's when I discovered the additional information relating

1    to waiver of Miranda and the two-hour statement.

2        Miss Denton doesn't have Mr. Lewis here today nor do I,

3    and I think both parties wish to explore why he would put that

4    Mr. Mason invoked his Miranda rights when the testimony here

5    is clearly opposite of that, and I think Miss Denton would

6    like -- prefer that I not offer just a report, and so --

7            THE COURT:  Well --

8            MS. HANSEN:  -- I think we're both asking for a

9    recess.

10           THE COURT:  Well, it's -- for the next point is up to

11   Miss Denton.

12       You may call your next witness or whatever it is and so I

13   didn't know that you had rested or anything yet.

14           MS. DENTON:  No, I've not rested yet, Your Honor, but

15   Miss Hansen is correct.  The government would request, Your

16   Honor, that you leave this hearing open and perhaps we can on

17   another day just produce the testimony of Galen Lewis and then

18   we would rest, if that's permissible by the Court.

19           THE COURT:  All right.  In other words -- you have

20   any objection to that, Miss --

21           MS. HANSEN:  No, Your Honor.

22           THE COURT:  -- Hansen?  Do you have evidence you wish

23   to present?

24           MS. HANSEN:  None at this time, Your Honor.

25           THE COURT:  All right.  Then I take it then we just

 1    recess the hearing until when?

 2            MS. DENTON:  The Court's next available opportunity I

 3    could get --

 4            THE COURT:  Where is the agent?

 5            MS. DENTON:  Inspector Lewis.  He -- he works -- he's

 6    local.

 7            THE COURT:  Is he a local agent?

 8            MS. DENTON:  Yes, he is, Your Honor.

 9            MS. HANSEN:  I'm gone next week, Judge, except for

10    Monday.  Actually, I'm not here Monday, sorry.

11            THE COURT:  What about -- what about the 16th in the

12    afternoon which is a Tuesday?

13            MS. HANSEN:  That's fine, yes.

14            MS. DENTON:  I -- I believe that's fine for me too.

15            THE COURT:  1:30?

16            MS. DENTON:  Okay.  On the 16th?

17            THE COURT:  On the 16th of June.  All right.

18    Anything further then we need to do today then?

19            MS. DENTON:  Your Honor, there is one case that would

20    pertain just strictly to the search that I did not include in

21    my brief.  I gave a copy of the case to defense counsel.  I'd

22    also like to submit to the Court in support of the search.

23    It's *United States vs. Alama* -- Alamama (phonetic).  If I may,

24    Your Honor?

25            THE COURT:  Yes.

1          MS. DENTON:  Other than that, Your Honor, the

2     government doesn't have anything further for today.

3          THE COURT:  All right.  We'll be in recess then.

4          MS. DENTON:  Thank you, Judge.

5     (Recess had at 10:57 a.m. on June 3rd, 2009.)

6     (At 1:29 p.m. on June 16, 2009, with counsel for the

7     parties and the defendant present, the following proceedings

8     were had:)

9          THE COURT:  ... United States vs. Mason carrying the

10    number of 8:09CR125.

11         Counsel enter their appearance for the record, please.

12         MS. DENTON:  Yes, Your Honor.  Good afternoon, Sandra

13    Denton for the United States.

14         MS. HANSEN:  Good afternoon, Your Honor.  Please show

15    the appearance of Julie Hansen for Mr. Mason.

16         THE COURT:  We're here on filing number 20 as amended

17    orally on June 3rd, I believe, that the defendant added the

18    additional motion to suppress statements.  At that time --  At

19    the conclusion of the testimony on June 3rd, there was a

20    request for a supplemental hearing with additional witnesses.

21       Miss Denton.

22         MS. DENTON:  Your Honor, at this time, the government

23    is going to concede on the motion to the -- motion to suppress

24    the statement alone.

25         THE COURT:  All right.  The --  And that was the

1    statement at police headquarters; is that right?

2            MS. DENTON:  Yes, Your Honor.

3            THE COURT:  All right.  Does that cover your motion

4    to suppress, Miss Hansen?

5            MS. HANSEN:  It does.

6            THE COURT:  All right.  Then that leaves only the

7    motion to suppress the search of the residence.

8        Miss Hansen.

9            MS. HANSEN:  We --  I think Miss Denton had one

10   matter she wanted to take care of.

11           THE COURT:  All right.

12           MS. DENTON:  Your Honor, I failed to offer Exhibit

13   No. 4 into evidence, it's a photograph, and the government

14   would offer that at this time before resting.

15           THE COURT:  Which is --  All right.

16           MS. HANSEN:  No objection, Your Honor.

17           THE COURT:  Exhibit 4'll be received.

18       All right.  Then Miss Hansen.

19           MS. HANSEN:  Your Honor, we have no evidence.

20           THE COURT:  All right.  And you wish to be heard on

21   the motion?

22           MS. HANSEN:  Judge, it's our position that

23   Mr. Mason's mother indicated that while he wasn't living at

24   the house that he did stay there occasionally, that he stayed

25   the night there that evening -- or the early morning hours at

1    least there that evening.  He --  It's the same area that he

2    was in when officers arrived at the house.

3        There --  The area included a space where there was a

4    couch and a love seat type of situation.  In any event,

5    Mr. Mason's position is, is that he was at least a guest -- at

6    bare minimum a guest at his mother's residence and that he had

7    a privacy interest in the areas that were searched.

8        The specific area that was -- I think evidence was

9    located I think was a bedroom downstairs which was his

10   sister's -- the testimony was that that was a sister's

11   bedroom, but there was also a common area that was searched.

12   It's our position that Mr. Mason was never informed that there

13   was going to be a search.  It's our position that there hasn't

14   been a sufficient showing of a voluntary waiver by Mr. Mason's

15   mother of the area.

16       We're asking the Court to take that into consideration

17   and suppress the physical evidence that was retrieved from

18   the -- underneath the steps where a panel had to be removed to

19   locate the item, specifically a weapon in this case, and that

20   that particular item was retrieved without Mr. Mason's

21   permission.

22       There was also --  And I can't recall if it was a box of

23   ammunition or individual shells that was retrieved from the --

24   what I believe was the common area, the area which Mr. Mason

25   stayed in which would have been where the couch was located,

1    and Miss -- his mother, Miss Mason, indicated that she wasn't

2    aware of anything -- any items that would match that

3    description.

4         Also found near that area or in that area was -- and I

5    believe it was a -- a -- a BB gun, but it looked like a rifle

6    that had been altered a little bit.  I believe the occupants

7    of the home advised that they -- that property was not their

8    property.

9         Mr. Mason had an interest -- a privacy interest in the

10   area that was searched, and it's our position that he was not

11   consulted, and as a result, he didn't give his permission

12   and -- and, therefore, the evidence should be suppressed.

13             THE COURT:  Miss Denton.

14             MS. DENTON:  Your Honor, first of all, there's a

15   standing issue with regard to Mr. Mason.  There is no evidence

16   before you whatsoever that he was even an overnight guest.

17   The testimony was -- was that Mrs. Mason stated to police

18   officers that he came over that morning and got the van to go

19   to his probation officer meeting.

20        Additionally, you heard evidence, Your Honor, that

21   Mrs. Mason stated that since the defendant's release from

22   prison that he had been living with his brother.  He even

23   listed that on his license as his address.  So there was no

24   evidence that Mr. Mason was even at a minimum an overnight

25   guest.

1           But even if you do find, Your Honor, that he was an

2    overnight guest, valid consent was obtained from Mrs. Mason.

3    At the time, if you recall, the officers stated that they had

4    Mrs. Mason and some other females in the van of Officer

5    Gassaway and it was at that time that the consent to search

6    was gone over with her.

7           Mr. Mason and his co-defendant Mr. Smith were still in

8    the home at the time that Officer Gassaway had obtained the

9    consent form from Mrs. Mason.  They remained in the home for

10   90 more minutes.  The case law that the government

11   supplemented the Court with at our last court hearing is

12   exactly on point with this case.

13          Mr. Mason chose to make himself unavailable to law

14   enforcement by holing himself up in the house and valid

15   consent was obtained from another co-occupant.  That case came

16   down after *Georgia v. Randolph*, Your Honor, so the consent

17   from Mrs. Mason was valid on that occasion.

18          The evidence in question, though, Your Honor, that the

19   government intends to use at trial -- we intend to use

20   evidence from the first search, but the second search which is

21   the one that took place after Mr. Mason was in custody.

22          When Mr. Mason was in custody, the police found out

23   through his co-defendant Donnell Smith that the actual gun

24   used in the robbery was still in the house.  It's at that time

25   then law enforcement first called Mrs. Mason, asked her for

1    permission to search.  She invited them to come back over, and

2    when they arrived at the house, they once again asked her to

3    come in, and she let them in and let them retrieve the gun

4    that was used in the robbery.

5         That search was also permissible, Your Honor, even if you

6    find that the defendant was an overnight guest as the

7    defendant was in custody at that time.  He wasn't a present

8    objecting co-occupant which is what *Georgia v. Randolph*

9    requires, so in all circumstances, Your Honor, the police did

10   not violate the defendant's constitutional rights, and we ask

11   that you overrule the motion to suppress the physical

12   evidence.

13             THE COURT:  Anything further, Miss Hansen?

14             MS. HANSEN:  No, Your Honor.

15             THE COURT:  All right.  The matter will be deemed

16   submitted upon the filing of the transcript.  The clerk will

17   order it.

18        Anything further from the government?

19             MS. DENTON:  No, Your Honor.

20             THE COURT:  Miss Hansen?

21             MS. HANSEN:  No, Your Honor.

22             THE COURT:  All right.  We'll be in recess.

23             MS. DENTON:  Thank you, Judge.

24        (Adjourned at 1:37 p.m. on June 16, 2009.)

25

```
 1        I, Rogene S. Schroder, certify that the foregoing is a

 2   correct transcription to the best of my ability from the

 3   digital recording of the proceedings held in the

 4   above-entitled matter.

 5        s/Rogene S. Schroder              June 19, 2009
              Transcriber                       Date
 6
                              I-N-D-E-X
 7
                         Direct  Cross  Redirect  Recross
 8
     WITNESSES:
 9   FOR THE PLAINTIFF:

10   Jeffrey Gassaway            4      15

11   Kerry Morfeld              16      27      31

12   Matt Chandler              33      42      44       46

13
                                               Ruled
14   EXHIBITS:                      Offered      On

15   1.  Permission for Search       11         11

16   2.  Rights Advisory Form        25         25

17   3.  Photograph                  39         39

18   4.  Photograph                  51         51

19

20

21

22

23

24

25
```